IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| MARCUS SEWELL, JR., and | ) | |
|---|---|---|
| AMBER SEWELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | No. 3:24-CV-406-TAV-JEM |
| WILDERNESS DEVELOPMENT | ) | |
| CORPORATION a/k/a WILDERNESS | ) | |
| AT THE SMOKIES a/k/a/ SOAKY | ) | |
| MOUNTAIN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

This case is before the Court pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendant's Motion to Compel Rule 35 Neuropsychological Examination of Marcus Sewell, Jr. ("Motion to Compel") [Doc. 85]. Plaintiff Marcus Sewell, Jr. ("Plaintiff") responded in opposition [Doc. 89],[1] and Defendant filed a reply [Doc. 91]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a).

For the reasons set forth below, the Court **GRANTS** Defendant's motion [**Doc. 85**].

I. **BACKGROUND**

On February 24, 2024, Plaintiffs filed a lawsuit seeking compensation for personal injuries arising from an incident that occurred at Defendant's waterpark in 2022 [Doc. 1 p. 2]. They allege that Defendant's employee "directed Plaintiff . . . to go down [a water] slide while it was occupied

---

[1] While there are two Plaintiffs, Marcus Sewell, Jr., and Amber Sewell, only Plaintiff Marcus Sewell, Jr., responded to the Motion to Compel [*See* Doc. 89].

by another patron," and that "[he] collided with said other patron, and, as a direct and proximate consequence, suffered serious injury including, without limitation, traumatic brain injury and injury to his cervical and thoracic spine" [*Id.* at 2–3].

On August 25, 2023, Matthews Gwynn, M.D., an orthopedic/neurosurgical physician, conducted an independent medical examination ("IME") of Plaintiff for Defendant [Doc. 85 p. 2; Doc. 86 p. 2]. According to Defendant, the IME was "limited to structural and physiological aspects of then-alleged head, back, and neck injuries" [Doc. 86 p. 2; *see also* Doc. 85 p. 2].

Defendant states that over a year later, on November 14, 2024, Plaintiff disclosed Daniel D. Eisenman, Ph.D. ("Dr. Eisenman"), a neuropsychological expert [Doc. 86 p. 2; *see also* Doc. 85 p. 3]. Defendant claims that it made a timely request for medical records and expert reports but that it "did not receive the underlying neuropsychological records until September 4, 2025" [Doc. 86 p. 2; *see also* Doc. 85 p. 3]. Defendant asserts that the "records reflect a single clinical neuropsychological evaluation by [Dr.] Eisenman . . . , conducted on October 4, 2022, and a speech language-cognitive assessment by Tiffany McCusker, CCC-SLP, on November 20, 2023" [Doc. 86 p. 2; *see also* Doc. 85 p. 3].

On November 6, 2025, Defendant filed the Motion to Compel, requesting that Plaintiff undergo an IME [Doc. 85]. Defendant claims that the "allegations, and the damages sought, place [Plaintiff's] neuropsychological functioning squarely at issue" [*Id.* at 2]. Specifically, Defendant contends that the Complaint "allege[s] [Plaintiff] sustained a traumatic brain injury ('TBI') and post-concussion syndrome and continues to suffer cognitive and psychological complaints including: memory loss, attention, process and reasoning deficiencies, and emotional/behavioral changes" [*Id.*].

2

> As set forth in the Declaration of Dr. Brandon Baughman, [Defendant explains that] the existing clinical assessments are methodologically insufficient because . . . the testing:
>
> a. Lacks adequate performance and symptom validity testing necessary to verify authenticity of reported deficits;
>
> b. Omits sustained-attention measures and appropriate reading rate/comprehension testing despite opinions referencing those cognitive domains;
>
> c. Reflects internal inconsistencies and atypicalities;
>
> d. Contains non-standardized screening and score interpretation errors.

[*Id.* at 3]. According to Defendant, "[T]he sole clinical examination is severely dated and does not assess [Plaintiff's] current physical and neuropsychological condition" [*Id.*]. Defendant argues that it therefore needs "a complete neuropsychological examination . . . to fully evaluate [Plaintiff's] asserted injuries, required treatments, and overall prognosis" [*Id.* at 4]. Defendant submits it is necessary "to differentiate if [Plaintiff's] reported symptoms are due to a physical brain injury, pre-existing conditions, or psychological factors . . . [and that b]oth the neurophysiological and neuropsychological examinations are needed to provide objective, comprehensive evaluation of the nature and extent of [Plaintiff's] injuries and the short and/or long-term limitations" [*Id.*]. Defendant argues there is good cause for the neuropsychological examination because the "requested examination tests the cognitive, mental, and behavioral impact from the injury with specific focus on functional and psychological consequences of known or suspected brain injury" [*Id.*].

Plaintiff responds and concedes that his "neuropsychological condition is in controversy," but he denies that good cause exists for an IME conducted by Defendant's retained expert [Doc. 89 p. 1]. According to Plaintiff, "Defendant has not shown the challenged testing was an improper basis for Plaintiff's expert to form an opinion, [as] [its] expert simply insists that the

testing conducted was not the full battery of tests he would have conducted to work the case up for litigation" [*Id.* at 1–2]. Plaintiff argues the requirement to conduct a Rule 35 examination is "more than a simple showing that the condition is in controversy and the other party's expert would like to do more testing" [*Id.* at 2].

In response to Defendant's argument that the previous IME was limited to structural and physiological aspects, Plaintiff contends that "Dr. Gwynn conducted neurocognitive testing, reviewed the records of Plaintiff's treatment for post-concussive syndrome, and states an opinion regarding the same" [*Id.*]. Further, Plaintiff submits that "there are less invasive means to obtain the information sought" [*Id.*]. Specifically, Plaintiff proposes that "Defendant's new expert can depose Plaintiff's treating physician . . . and act as a rebuttal expert," noting that the deposition is being scheduled [*Id.* at 3]. As for the concerns that the 2022 report is stale, Plaintiff suggests that "[he] can follow up with his physician and obtain an updated report" [*Id.*]. "If specific additional testing is deemed necessary," Plaintiff claims that "it can be obtained in another, more targeted manner . . . [such as] an expert of Plaintiff's choice or a more limited encounter with an expert selected by Defendant" [*Id.*]. Finally, if the Court grants the motion, Plaintiff asks "that the testing be limited to a single day with defined breaks" because "the expert's statement that he will allow 'routine' breaks is insufficient" [*Id.*].

Defendant replies that "Plaintiffs' response does not rebut the showing that [Plaintiff's] mental and psychological condition is squarely 'in controversy' and that 'good cause' exists for a limited, targeted, neuropsychological examination" [Doc. 91 p. 1]. Rather, Defendant states that Plaintiff conflates the previous IME with the now requested examination, that he mischaracterizes the proposed examination as a duplicative fishing expedition, and disregards that he has placed his alleged anxiety, depression, and PTSD at issue [*Id.*].

4

Specifically, Defendant contends that "[a] neurologic post-concussion IME, which lasted for a total of 75 minutes . . . is different from, and does not substitute for, a comprehensive neuropsychological examination conducted by a board-certified clinical neuropsychologist" [*Id.* at 2]. Defendant submits that "Plaintiffs' own pleadings and discovery responses place [Plaintiff's] mental and neuropsychological condition squarely in controversy," noting that Plaintiff "further alleges significant emotional and psychiatric injury, including anxiety, depression, and PTSD, and contends that these conditions cause continuing mental anguish and preclude him from returning to full-time work" [*Id.* at 3]. Defendant maintains that "when a plaintiff affirmatively asserts mental or physical injury and intends to support those allegations with medical and expert proof, the 'in controversy' requirement is satisfied and good cause exists for an examination targeted at those very conditions" [*Id.*]. Defendant further argues that it does "not seek unlimited or open-ended testing," but rather requests "a single, one-day (approximately eight-hour) neuropsychological examination focused on the precise domains [Plaintiff] claims are impaired" [*Id.*]. Defendant claims that it "is entitled to its own independent Rule 35 examination, particularly where, as here, Plaintiff intends to rely on neuropsychological or mental-health evidence in support of alleged permanently debilitating anxiety, depression, and PTSD" [*Id.*]. "Finally, to the extent Plaintiff[] raise[s] objections to the logistics or conditions of the examination," Defendant asserts that "those concerns do not defeat the showing of good cause and can be addressed by reasonable conditions in the Court's order" [*Id.* at 5]. Defendant submits that "[a] one-day evaluation with breaks, conducted at or near Plaintiff's hometown by a licensed neuropsychologist, is not unduly burdensome in light of the stakes of the litigation" [*Id.*].

5

## II.     ANALYSIS

Rule 35 of the Federal Rules of Civil Procedure provides that, upon motion for good cause and notice to all parties and the person to be examined, "the court where the action is pending may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1)–(2). In order to justify the need for an IME, the defendant must show (1) that the plaintiff has put his physical or mental condition "in controversy," and (2) that there is "good cause" for the examination. *Schlagenhauf v. Holder*, 379 U.S. 104, 118–19 (1964) ("A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." (citation omitted)).

"Plaintiff concedes his neuropsychological condition in in controversy[,]" but he "denies that good cause exists for [a second] IME" [Doc. 89 p. 1 (citation omitted)]. "While Rule 35 requires courts to 'specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it' the Rule does not expressly limit the number of such good-cause examinations that may be ordered." *S.R. v. Kenton Cnty. Sheriff's Office*, No. 15-143, 2018 WL 11420453, at *2 (E.D. Ky. Feb. 12, 2018) (citing *Roberts v. AC Marine, Inc.*, No. 12-2317, 2013 WL 1814923, at *4 (E.D. La. Apr. 29, 2013)); *see also Booth v. Mohave Transp. Ins. Co.*, No. 13-6746, 2014 WL 3881203, at *4 (E.D. La. Aug. 6, 2014) ("Although Rule 35 does not limit a party to one medical examination, *good cause* under Rule 35[] may entitle a party to obtain more than one examination if the circumstances of an action warrant the same." (citations omitted)); *Vopelak v. Williams*, 42 F.R.D. 387, 389 (N.D. Ohio 1967) (granting a second Rule 35 examination).

6

But Rule 35 examinations, "like all other forms of discovery, are subject to the general provision of Rule 26(c) that the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *S.R.*, 2018 WL 11420453, at *3 (quoting *Roberts*, 2013 WL 1814923, at *4). Therefore, "[w]here the moving party has already made an examination in the past, . . . the court will require a stronger showing of necessity before it will order repeated examinations." *Id.* (quoting *Roberts*, 2013 WL 1814923, at *4).

Courts have relied on four factors when weighing whether there is sufficient good cause for a party to submit to a successive examination:

>   (1)   separate injuries calling for examination by distinct medical specialties;
>
>   (2)   where a physician requires assistance of other consultants before he can render a diagnosis;
>
>   (3)   where the first examination was not adequate or complete; and
>
>   (4)   where a substantial time lag occurred between the initial examination and trial.

*Daum v. Allstate Fire & Cas. Ins. Co.*, No. 13-64, 2014 WL 12600126, at *3 (D. Mont. Oct. 28, 2014) (finding that a two-and-a-half-year lag time between initial examination and trial, combined with an incomplete initial examination, warranted a second extension). The parties focus only on the third and fourth factors, so the Court does as well and finds that Defendant has made a strong showing of good cause for a second IME.

Analyzing the third factor, Plaintiff claims that the requested examination is not necessary because Dr. Gwynn already conducted neurocognitive testing and that Defendant's basis—that is, "their expert simply insists that the testing conducted was not the full battery of tests he would have conducted" is insufficient [Doc. 89 p. 2]. Defendant rebuts Plaintiff's argument that it is

7

Case 3:24-cv-00406-TAV-JEM   Document 96   Filed 12/03/25   Page 7 of 10   PageID #: 294

"duplicative" by contending that "[t]he physician IME conducted on August 25, 2023 addressed structural and physiological issues – it did not include neuropsychological measures. The 2022 and 2023 clinical assessments do not supply validity data, omit key cognitive domains, and are no longer current" [Doc. 91 at 7]. Defendant also has submitted Dr. Gwynn's IME of Plaintiff [Doc. 91-1]. As asserted by Defendant, Dr. Gwynn notes in his report "I do not see records of a neuropsychological evaluation that is cited a few times and other medical records" [Doc. 91-1 p. 3]. The IME appears to have consisted of "general observations of mentation, mood, and behavior," as well as a screening instrument [Doc. 91 p. 2 (citing Doc. 91-1 p. 4)]. As argued by Defendant, these "cognitive comments . . . do not include the standardized, multi-domain neuropsychological testing with embedded performance-validity and symptom-validity measures that a forensic neuropsychologist would conduct" [*Id.*]. The Court therefore finds the third factor weighs in favor of Defendant's request.

Examining the fourth factor, the Court finds that a substantial time lag between the initial examination and trial also supports a second examination. *Vopelak*, 42 F.R.D. at 389 (granting second examination upon finding that "a long period of time intervening between the [first] examination and trial" combined with change in physical condition of the plaintiff afforded justification for a further examination). Defendant asserts that "the 2022 and 2023 assessments are not contemporaneous with [Plaintiff's] current condition" [Doc. 86 p. 6]. More than two years will have passed by the trial date, currently set for July 28, 2026 [Doc. 95]. This too supports another IME. *See S.R.*, 2018 WL 11420453, at *3–4 (allowing a second examination where there was indication the initial examination was not adequate or complete and where a 19-month period had passed between the upcoming trial date and the initial examination of plaintiffs); *Daum*, 2014 WL 12600126, at *3 (finding that a two-and-a-half-year lag time between initial examination

8

and trial, combined with an incomplete initial examination, warranted a second extension); *Roberts*, 2013 WL 1814923, at *4 (allowing second examination where extensive length of time passed between treatment and trial and defendant's expert did not have adequate opportunity to investigate plaintiff's injuries).

Plaintiff argues that "Defendant's new experts can depose Plaintiff's treating physician regarding the asserted deficiencies in his report, obtain and review raw data from that physician, and act as a rebuttal expert" [Doc. 89 p. 3]. Plaintiff suggests that "[i]f there are concerns that the 2022 report is stale, Plaintiff can follow up with his physician and obtain an updated report" [*Id.*]. Alternatively, Plaintiff proposes that "[i]f specific additional testing is deemed necessary it can be obtained in another, more targeted manner than through a second, full-spectrum, extraordinarily invasive examination by Defendant's own expert" [*Id.*]. Plaintiff offers the following alternatives: "either an expert of Plaintiff's choice or a more limited encounter with an expert selected by Defendant" [*Id.*]. The Court finds that Plaintiff has not supported the argument that Defendant's proposed testing is "extraordinarily invasive" and has not shown that it is not proportional to the needs of the case. And Defendant submits that "[t]he testing will be limited in scope and will last no longer than eight hours with time for breaks . . . [and] will consist of a clinical interview and a standardized battery" [Doc. 86 p. 6].

Accordingly, because Defendant has made a strong showing of good cause and because the requested IME is not disproportionate to the needs of the case, the Court "must specify the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(2)(B). Defendant cites a declaration from its proposed expert that details the examination's manner, conditions, scope and reporting obligations, and requests that the Court include these specifications in its Order [Doc. 86 p. 8 (citing Doc. 85-1)]. Plaintiff

9

requests the Court to order, pursuant to Defendant's suggestion, that "the IME [is conducted] at a convenient location, to allow the interview portion to be recorded, and to require the expert to record the testing portion to be conveyed directly to Plaintiff's retained expert for review, with the raw data" [Doc. 89 p. 3]. Plaintiff further asks "that the testing be limited to a single day with defined breaks" and asserts that "the expert's statement that he will allow 'routine' breaks is insufficient" [*Id.*].

The Court **ORDERS** the parties to (1) meet and confer, via in person, or by telephone or video conference, about the appropriate time, place, manner, conditions, and scope of the examination and (2) file a joint status report setting forth the parameters of the Rule 35 examination on or before **December 8, 2025**.[2] Following receipt of the joint status report, the Court will issue an order "specify[ing] the time, place, manner, conditions, and scope of the examination, as well as the person or persons who will perform it." Fed. R. Civ. P. 35(a)(2)(B).

## III. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant's Motion to Compel Rule 35 Neuropsychological Examination of Marcus Sewell, Jr. [**Doc. 85**], and the Court orders Plaintiff Marcus Sewell, Jr. to submit to an independent medical examination pursuant to Federal Rule of Civil Procedure 35.

**IT IS SO ORDERED.**

ENTER:

Jill E. McCook
United States Magistrate Judge

---

[2] At the time Defendant filed its motion, trial was set for May 19, 2026, and Defendant proposed that Dr. Braughman conduct the examination on December 5, 2025, at 9:00 a.m. to 5:00 p.m. [Doc. 85 p. 5]. The trial date is now July 28, 2026 [Doc. 95].